## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## - SAN ANTONIO DIVISION -

| | | |
|---|---|---|
| **TERESITA LOPEZ, Individually and on behalf of the ESTATE OF JESUS JOSE "J.J." LOPEZ, Deceased** | § § § § | |
| **V.** | § § | **CIVIL ACTION NO. 5:18-cv-00711** |
| **BEXAR COUNTY, TEXAS; SHERIFF SUSAN PAMERLEAU, Individually; LIEUTENANT CHARLES CAGLE, Badge No. 2721, Individually; DEPUTY ANDRES ALDANA, Badge No. 1014, Individually; and DEPUTY HERIBERTO RIVERA, Badge No. 3035, Individually** | § § § § § § § § § | **(JURY DEMANDED)** |

## PLAINTIFFS' ORIGINAL COMPLAINT & DEMAND FOR JURY TRIAL

Plaintiff, TERESITA LOPEZ,  Individually and on behalf of the ESTATE of JESUS JOSE "J.J." LOPEZ,  Deceased; and complaining of and about BEXAR COUNTY, TEXAS; former BEXAR COUNTY SHERIFF SUSAN PAMERLEAU, Individually; LIEUTENANT CHARLES CAGLE, Individually; DEPUTY ANDRES ALDANA, Individually; and DEPUTY HERIBERTO RIVERA, Individually.

### - Introduction -

**Suicide is often the single most common cause of death in correctional settings. Jails, prisons, and penitentiaries are responsible for protecting the health and safety of their inmate populations.**  - "*Preventing Suicides in Jails and Prisons*," World Health Organization, 2007.

Mrs. Teresita Lopez, the mother of JESUS JOSE "J.J." LOPEZ, brings this wrongful death and survival action for money damages and injunctive relief against BEXAR COUNTY and the individually-named Defendants.



## I. PARTIES

### A. Plaintiffs

1.     Plaintiff, TERESITA LOPEZ ("Mrs. Lopez")  is a natural person who resides and did reside in Bexar County, Texas, at all relevant times.  Mrs. Lopez was JESUS JOSE "J.J." LOPEZ's ("J.J.") legal and biological mother.  Mrs. Lopez acts herein individually and on behalf of J.J.'s Estate.  She will be referred to herein at times "Mrs. Lopez."

### B. Defendants

2.     Defendant, BEXAR COUNTY, TEXAS (the "County"), is a political subdivision of the State of Texas.  This Defendant may be served with process by serving the Bexar

County Judge, Mr. Nelson W. Wolff at 101 W. Nueva, 10th Floor, San Antonio, Texas 78205. The County funds and operates the Bexar County Adult Detention Center (hereafter "the Bexar County jail"), employs and compensates the Bexar County jail, and is charged with ensuring that, at all times, the Bexar County jail remains in compliance with federal and state law. The County is a recipient of federal funds.

3.      Defendant, BEXAR COUNTY SHERIFF SUSAN PAMERLEAU (the "former Sheriff"), may be served with process at: 100 Dolorosa, San Antonio, Texas 78205 or wherever she may be found.  At all relevant times, Susan Pamerleau was the Sheriff in charge of the Bexar County jail, acting at all relevant times under color of state law. The Sheriff was responsible for Jesus Jose Lopez's safekeeping and care. She acted or failed to act in the course and scope of her duties.   She is sued for damages in her individual capacity.

4.      Defendant, LT. CHARLES CAGLE, badge no. 2721 ("Lt. Cagle"), is a resident of Bexar County, Texas and may be served at his place of employment, the Bexar County Adult Detention Center located at 200 N. Comal Street, San Antonio, Texas 78207. He was acting under color of law.  He is sued for damages in his individual capacity.

5.      Defendant, ANDRES ALDANA, badge no. 1014 ("Deputy Aldana"), is a resident of Bexar County, Texas and may be served at his place of employment, the Bexar County Adult Detention Center located at 200 N. Comal Street, San Antonio, Texas 78207. He  was acting under color of law.  He is sued for damages in his individual capacity.

6.     Defendant, HERIBERTO RIVERA, badge no. 3035 ("Deputy Rivera"), is a resident of Bexar County, Texas and may be served at his place of employment, the Bexar County Adult Detention Center located at 200 N. Comal Street, San Antonio, Texas 78207. He  was acting under color of law.  He is sued for damages in his individual capacity.

## II. JURISDICTION

7.     Jurisdiction is invoked pursuant to 28 U.S.C. §1331 because the claims involve a question of federal law under 42 U.S.C. §1983 and 42 U.S.C., §§12181, et seq., the Americans with Disabilities Act (ADA), and the Rehabilitation Act, 29 U.S.C. §794.

8.     All conditions precedent to filing this action have been fulfilled.

## III. VENUE

9.     Venue is proper in this cause in the Western District of Texas pursuant to 28 U.S.C.§1391(a)(2) because all or a substantial part of the events which gave rise to this cause of action occurred in the Western District of Texas.

## IV. FACTS

10.     Jail suicides, as the Defendants knew before incarcerating J.J., are a huge problem in the United States.  One-thousand fifty-three (1,053) people died in local jails in 2014, three-hundred seventy-two (372) of which died as a result of suicide.  The Defendants also knew when incarcerating J.J. that most jail suicides occur by hanging/strangulation, with prisoners using objects available to them as ligatures.  Prisoners commonly use bed linens, clothing (including drawstrings), telephone cords, and trash bags.

11.     Approximately 4,000 inmates, including presumed-innocent/pre-trial detainees are housed at the Bexar County Jail, making it the 16th largest county jail in the country.[1]

12.     Over 800 of the inmates suffer from diagnosed mental health issues.[2]

13.     In 2015, there were 1,500 suicide attempts at the Bexar County Jail.[3]

14.     In the first six months of 2016, Bexar County Jail guards placed 712 inmates on suicide watch.

15.     Starting in April 2016, Jesus Jose ("J.J.") Lopez was a presumed-innocent/pre-trial detainee held at the Bexar County Jail.  Like the more than 800 others, J.J. suffered from diagnosed mental illness.

16.     J.J. was born in December 1997, in San Antonio, Texas, to Teresita Lopez and Jessie Travieso.  J.J. was severely mentally and intellectually troubled.  Before his arrest, on or about April 8th, 2016, J.J. was diagnosed with major depressive disorder and a learning disorder.  People with major depressive disorder are prone to recurrent thoughts of death, recurrent suicidal ideation, suicide attempts, or specific plans for committing suicide as well as other symptoms including feelings of sadness, emptiness, and hopelessness.

17.     On April 9, 2016 at approximately 1:58 a.m., J.J., who had just turned age 18 on December 20, 2015, is booked by Bexar County Jail officials.  All Bexar County Sheriff

---

[1] Texas Public Racio, KSTX - San Antonio; Lessons Learned from A Night in the Bexar County Jail; Anti-Suicide Effort is A 24/7 Job

[2] Id.

[3] Id.

Department officers mentioned in this pleading were acting or failing to act in the course and scope of their duties for Bexar County at the referenced times and under color of state law.

18.     Based on information and belief, J.J.'s father advised local law enforcement on April 8th or April 9th that J.J. was suffering from suicidal ideation, explaining J.J. could not take care of himself.

19.     Between April 9th at 3:13 p.m. when the ("Initial Medical Screening") ("screening form") is started to April 11th at 3:24 p.m. when the ("Last Update") is completed, Bexar County Jail officials learned J.J. suffered from serious mental illness.  Bexar County Jail, based on the Initial Medical Screening interview of J.J., knew J.J. had previously received local mental health services, noting on the screening form "has hx [history] of depression documented."

20.     Since early April 2016, Bexar County knows J.J. is a person with a disability.

**Comments:**
- Comments

Consents signed
PPD given to left arm
STD screening refused and refusal signed
Sick call explained
Inmate denied mental health issues, has hx of depression documented

**Referral 1:**
- Refer To
- Reason for Referral
- Priority

PPD Readings
PPD given to left arm
Clinically Indicated (1-2 days)

Requested by: Vestal, Betty J (RN), Jul-18-2016 11:14                    Page 2 of 3

21.     On May 7th, J.J. completes a Detention Health Care Services Sick Call Request, placing a check mark in the space corresponding to the "MENTAL HEALTH" category. According to J.J., he is hallucinating in that someone else besides his cell mate is in the cell.  J.J. then writes, "I'm stressing and having anxiety bad."



22.     On May 23rd, Bexar County Jail Inmate Management Information System Classification Report (#052316-21) reflects J.J. is "suicidal" and "going crazy." According to the report, J.J. "is going to hurt himself by using his towel to hang himself."

23.     J.J. is unable to care for himself at this time.

24.     He is a danger to himself.

25.    He is then placed on full suicidal protection (FSP) status.

26.    On May 27th, after receiving clearance, J.J. is returned to a general population status.

27.    On June 12th, Bexar County Jail Inmate Management Information System Classification Report (#061216-05) reflects J.J. is suicidal.  According to the report, "he wants to kill himself."

28.    J.J. was again placed on FSP because he could not care for himself.

29.    J.J. is a danger to himself.

30.    On June 16th, J.J. is cleared to return to a general population classification.

31.    On June 16th, J.J. is placed in cell #33, a two-person cell.

32.    Cell #33 is located on the second floor - located in a corner.

33.    Since June 16th, Bexar County Jail officers, including Sheriff Pamerleau by and through her deputies, consciously disregarded J.J.'s reasonable medical/mental health needs, choosing to ignore internal classification reports and medical records regarding J.J.'s suicidal tendencies, impulses and desire to harm himself.  Instead of meeting those needs, Bexar County Jail officials, including Defendants, Sheriff Pamerleau, Lt. Cagle, Deputy Aldana and Deputy Rivera, intentionally placed J.J. in an environment where J.J. could finally complete what he had expressed before - the taking of his own life.  Bexar County Jail officials, including Defendants, Sheriff Pamerleau, Lt. Cagle (who served as Shift Supervisor), Deputy Aldana and Deputy Rivera chose to put J.J, in a cell with items like bed sheets that would enable J.J. to hang himself.

34.    On July 14th at 7:00 a.m., the first shift for Bexar County Jail deputies charged with safeguarding and caring for detainees started.

35.    Defendant, Lt. Cagle, was the 1st Detail Shift Commander that day.

36.    Defendants, Sheriff Pamerleau, Lt. Cagle, Deputy Aldana and Deputy Rivera chose to ignore J.J., leaving him a cell with full knowledge that J.J. would likely attempt to harm or kill himself, and with the physical ability to do so through the use of bed sheets provided by Bexar County.  Defendants, Sheriff Pamerleau, Lt. Cagle, Deputy Aldana and Deputy Rivera showed a total and conscious disregard for J.J.'s safety and medical needs.  Defendants, Sheriff Pamerleau, Lt. Cagle, Deputy Aldana and Deputy Rivera also failed to provide any reasonable accommodation for J.J.'s medical needs. In fact, they provided no accommodation whatsoever for J.J.'s significant medical needs, his mental health issues, and his suicidal tendencies.

37.    Furthermore, Bexar County, during the entire relevant time period described in this pleading, did not have continuous monitoring of suicidal detainees nor did it have in place any video and/or audio monitoring equipment which captured J.J.'s cell in a manner allowing him to be monitored and/or watched by Bexas County Jail deputies and staff.  J.J. remained unmonitored and unable to care for himself.

38.    Later that July 14th morning, based on information and belief, at approximately 8:23 a.m., Defendant Aldana discovered J.J. with a bed sheet wrapped around his neck.

39.    According to internal Bexar County Jail documents, Defendant Aldana reported J.J.'s cell mate was asleep when he found J.J.  Code 1 blue was called by Defendant Aldana.

40.     Based on information and belief, during the early morning hours of July 14th, J.J. was not continuously monitored by Bexar County.

41.     Based on information and belief, due to the shift change at 7:00 a.m. that day, J.J. had not been monitored within the past 60 minutes by Defendants, Lt. Charles Cagle, Deputy Aldana nor Deputy Rivera.

42.     J.J. was then transported to University Hospital

43.     J.J. was pronounced dead on July 15th at 6:25 p.m. after University Hospital tests showed no brain activity.  The autopsy findings reflect "Asphyxia by hanging."

44.     At the time of his death, J.J. was merely 18 years old.

45.     Despite knowing J.J. was suicidal, Bexar County did not continuously monitor J.J. as there was no closed circuit television available to suicidal detainees.

46.     Based on information and belief, even today the Bexar County Jail does not have continuous monitoring of suicidal detainees - either through trained staff or video/audio monitoring.

47.     Moreover, based on information and belief, Bexar County Jail officials (during his three month detention) failed to update J.J.'s computer profile to reflect his suicidal episodes, which would have allowed staff to monitor and accommodate his disabilities.

```
---> NO INMATE RECORD FOUND
Bexar County              INMATE MANAGEMENT         Date: 07 15 2016
 Texas      JMOIMCI      INFORMATION SYSTEM  JMMIMCI  Time: 19:05:50
-------------------------------------------------------------------
 Inmate |  Cell  |  Agenda |  Text  |  Query |  Pop  |  Stat  |  Exit
-------------------------------------------------------------------
 Class |  Med  |  Enem  |  Unclas |  Prop  |  Bank  |  Risk  |  Vist
-------------------------------------------------------------------
   Classif   |  Screening  |   Exams   |   Physical  |   Dental
DPW
SID# 1017041   Name: $$$ NO INMATE FOUND $$$  DOB: __ __ __  Age:    Sex:
Action ---> _   Language:                                     Cell#
 _____
| _ Heart Problems   | _ HearingImpairment| _ Intox/Drugs |  _ Suicidal
| _ Allergies        | _ Deaf/Mute        | _ Intox/Alchl |  _ Mental Illness
| _ Amputee/Prosths  | _ Diabetic         | _ Prob Pregncy|  _ May Get Aggresve
| _ Prone to Seizures| _ Special Shoes    | _ Contagious  |  _ Retarded
| _ Vision Impairment|                    |
|                                         | _____
|               Limitations/Restrictions  |  _ Special Diet
|                                          |     Which one _____
|     _____  |  _ Suicide Risk
|                                          |----------------------
|     _____  | Code _____
| Date 07 15 2016 Time 19:05:50  Oper 19560  Term SHDK |
```

48.     According to Texas Attorney General's Custodial Death Report Database, from

2013 to present, the following persons committed suicide while detained at the Bexar

County Jail:

| Name | Age | Date of Death |
|------|-----|---------------|
| Danny Puenta | 56 | 8/28/2013 |
| Nathaniel Gamez | 26 | 2/7/2014 |
| Felix Chavarria | 33 | 11/27/2014 |
| Thomas C. Voigt | 42 | 6/21/2015 |
| Rodolfo Palafos | 54 | 7/5/2015 |
| Calvin J. Johnson | 33 | 11/10/2015 |
| **Victor D. Casas** | **41** | **6/28/2016** |
| **Jonathan E. Campos** | **22** | **7/9/2016** |
| **Jesus J. Lopez** | **18** | **7/15/2016** |
| **Melvin E. McKinney** | **41** | **7/22/2016** |
| Ricardo Gamez | 54 | 12/4/2016 |
| Skylab Gonzalez | 36 | 10/3/2017 |
| Anthony Luna | 27 | 10/21/2017 |
| Domingo Altamirano | 32 | 5/3/2018 |

49.     Based on information and belief, there is was an additional suicide in 2014, which

is not reported.

50.    Like J.J., Jonathan Eric Campos (just 5 days earlier) committed suicide by hanging on or about July 9, 2016. Based on information and belief, he was also found at approximately 8:00 a.m. - just 1 hour into that day's 1st shift.

51.    Over twenty-five  years ago, in November  1991,  the Texas Commission  on Jail Standards published the Guide for Development of Suicide Prevention Plans.  Even that long ago, when society and medical professionals as a whole knew much less than they have  learned  over  the  last  few  years,  the  Commission   recommended  continuous observation for high risk, acutely suicidal inmates who had attempted suicide.  Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit nearly 25 years ago (in 1992, unambiguously  wrote that the right  to  continual  monitoring  of  prisoners  with  suicidal  tendencies  was  clearly established.  In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother of a pre-trial detainee brought suit for the death of her child.  Although the mother did not  prevail,  Judge  Goldberg  warned  and  put  on  notice  all  policymakers  within  the jurisdiction of the United States Court of Appeals for the Fifth Circuit, regarding pre-trial detainees in need of mental health care (and specifically those with suicidal tendencies):

> Fortunately, the policymakers in charge can learn from their mistakes and take  the  necessary  additional  steps  to  insure  the  safety  of pretrial detainees  in  need  of  mental  health  care.  **Other  municipalities  should also   take   heed   of   the   tragic   consequences   which   arc   likely   to ensue   in   the   absence   of   adequate  safety  measures  to  deal  with detainees displaying suicidal  tendencies.**
>
> **What we learn  from the experiences  of Henderson County  is that when  jailers know   a detainee is prone  to committing suicide,  a policy of observing such  a detainee on a periodic,  rather than on a continuous,  basis,  will not suffice**; that vesting discretion in untrained jail personnel to,assess the need for, and administer, mental health care,

will not be responsive to the medical needs of mentally ill detainees; and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of its emotionally disturbed detainees. We need not remind jailers and municipalities that the Constitution  works day and night, weekends and holidays-it takes no coffee breaks, no winter recess, and no summer vacation.

So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees  with deliberate indifference to their  medical needs. But that does not insulate Henderson County, or any other   municipality,  from  liability  in  future  cases. **Jailers and municipalities beware! Suicide is a real threat in  the  custodial environment. Showing some concern  for those in custody, by taking limited  steps  to protect them,  will not pass muster unless the strides taken  to deal with the risk are calculated to work: Employing  only "meager measures that [jailers  and municipalities] know or should   know to be ineffectual" amounts to deliberate indifference. To sit idly by now and  await another, or even the first, fatality, in the face ofthe Henderson County  tragedy, would surely amount to deliberate indifference.**

*Id.* at 395-96 (emphasis added).

52.   The  blatant  constitutional  violations  at  the  Bexar  County  Jail described  by  this  complaint  were  so  clear  that  they  gained  media attention:



## 4 suicides in less than 4 weeks: Bexar County officials confirm latest death at jail

By **Tyler White**, mySA.com / San Antonio Express-News and **Rye Druzin**   Updated 5:05 pm CDT, Friday, July 22, 2016

### <u>The County's Policy, Practice, and Custom Regarding Bed Linens in Jail Cells Was a Moving Force Behind and Caused J.J.'s Death</u>

53.     Upon information and belief, Defendants Sheriff Pamerleau, Lt. Cagle, Deputy Aldana, and Deputy Rivera did absolutely nothing to modify the cell in which J.J. committed suicide.  Sheriff Pamerleau Lt. Cagle, Deputy Aldana, and Deputy Rivera acted with deliberate indifference, and/or acted in an objectively unreasonable manner. Removing bed linens would have been a relatively inexpensive way to have prevented J.J.'s death.  Instead, the County's policy and practice in choosing not to remove bed linens (after knowing that J.J. expressed wanting to commit suicide on at least two occasions - once using a towel) proximately caused, was the producing cause, and was a moving force behind J.J.'s death.  Sheriff Pamerleau was the chief policy maker for Bexar County regarding its jail operations at the time and, upon information and belief, Lt. Cagle, Deputy Aldana, Deputy Rivera also had authority to remove bed linens.

### The County's Policy, Practice, and Custom Regarding the Failure to Monitor Suicidal Detainees <u>*Immediately Before, During and Immediately After Shift Changes*</u> Was a Moving Force Behind and Caused J.J.'s Death

54.     Bexar County's policy, practice and custom was to fail to timely monitor suicidal detainees immediately before, during and immediately after shift changes was a moving force behind J.J.'s death.

55.     Sheriff Pamerleau, Lt. Cagle, Deputy Aldana and Deputy Rivera were aware that

immediately prior, during and immediately after shift changes suicidal detainees, like J.J., go unsupervised. Sheriff Pamerleau, Lt. Cagle, Deputy Aldana and Deputy Rivera were was aware that shift changes pose a danger in that suicidal detainees are unsupervised/unmonitored. Despite knowing shift changes pose dangers, in that suicidal detainees, like J.J., are more likely to go unmonitored, they took no action to eliminate the risk of suicidal detainees. Defendants acted with deliberate indifference, and/or acted in an objectively unreasonable manner.

56.     Bexar County's policy and practice in choosing not to monitor suicidal detainees during shift changes (after knowing that J.J. expressed suicidal tendencies on at least two occasions) proximately caused, was the producing cause, and was a moving force behind J.J.'s death.  Sheriff Pamerleau was the chief policy maker for Bexar County regarding its jail operations at the time and, upon information and belief, the Lt. Cagle also had authority to make the necessary shift changes so that  suicidal detainees can be timely monitored.

### The County's Policy, Practice, and Custom Regarding the Failure to Continuously Monitor Suicidal Detainees Was a Moving Force Behind and Caused J.J.'s Death

57.     Upon information and belief, Defendants Sheriff Pamerleau, Lt.  Cagle, Deputy Aldana, and Deputy Rivera did absolutely nothing to continuously monitor J.J.  Sheriff Pamerleau Lt.  Cagle, Deputy Aldana, and Deputy Rivera acted with deliberate indifference, and/or acted in an objectively unreasonable manner.   Instead, the County's policy and practice in choosing not to continuously monitor J.J. after knowing that J.J. expressed suicidal ideation on at least two occasions proximately caused, was

the producing cause, and was a moving force behind J.J.'s death.  Sheriff Pamerleau

was the chief policy maker for Bexar County regarding its jail operations at the time and,

upon information and belief, Lt. Cagle, Deputy Aldana, Deputy Rivera also had authority

to place J.J. in continuous monitoring.

### The County's Policy, Practice, and/or Custom Regarding the Minimum Number of Jailers Present was a Moving Force Behind and Caused J.J.'s Death

58.     Further, upon information and belief, Bexar County's policy, practice, and custom

regarding the minimum number of jailers present with a suicidal inmate showed

deliberate indifference.  Bexar County did not require more than one jailer to be present

with a suicidal inmate.  This policy was a proximate cause of, producing cause of, and a

moving force behind J.J.'s death and violation of his constitutional rights.

### The County Ratified the Natural Person Defendants' Actions

59.     Upon information and belief, neither the County, Sheriff Pamerleau, nor Lt.

Cagle took any action to reprimand any of the deputies who failed to monitor J.J.  In

fact, the County, the Sheriff and Lt. Cagle  fully approved of the manner in which J.J.

was handled by the County and its employees - from beginning to end.  Thus, the

County and its employees ratified the conduct of all persons mentioned in this pleading

and this confirmed the unconstitutional Bexar County policies, practices, and/or

customs.    The fact that the natural person Defendants acted together alone

demonstrates County policy, practice, and custom.  In other words, the natural person

Defendants were the County, as they acted and failed to act with regard to J.J.  Thus,

their joint action demonstrated County policy, practice, and custom.

## V. CAUSES OF ACTION

**Cause of Action Against Sheriff Pamerleau, Lt. Charles Cagle, Deputy Rivera and Deputy Aldana Under 42 U.S.C. § 1983 for Violation of J.J. Lopez's 14th Amendment Due Process Right to Reasonable Medical Care, to be Protected, and Not to be Punished as a Pre-trial Detainee (Episodic Act or Omission)**

60.   Plaintiffs incorporate the allegations of paragraphs 1 through 59 above.

61.   In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendants, Sheriff Pamerleau, Lt. Cagle, Deputy Rivera and Deputy Aldana, are liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating J.J.'s right to reasonable medical care guaranteed by the Fourteenth Amendment to the United States Constitution. Pre–trial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals. Sheriff Pamerleau, Lt. Cagle and Deputies Rivera and Aldana acted and failed to act under color of state law at all times referenced in this pleading. Sheriff Pamerleau, Lt. Cagle and Deputies Rivera and Aldana, wholly or substantially, ignored J.J.'s suicidal tendencies and his obvious serious medical needs, and they were deliberately indifferent to those medical needs. Sheriff Pamerleau, Lt. Cagle and Deputies Rivera and Aldana were aware and thoroughly knowledgeable of J.J.'s suicidal impulses due to multiple communications regarding those impulses, as well as his serious mental health issues. They gained this knowledge through reports reflecting J.J.'s suicidal tendencies. Sheriff Pamerleau, Lt. Cagle and Deputies Rivera and Aldana violated

clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents. Therefore, they are not entitled to qualified immunity. Sheriff Pamerleau's, Lt. Cagle's and Deputies Rivera's and Aldana's denial of reasonable medical care, total disregard for J.J's health and safety, and total disregard for J.J.'s suicidal tendencies and propensity to hurt himself caused, proximately caused, and was a producing cause of J.J.'s death and other damages suffered by J.J., Teresita Lopez (Independently and on behalf of the Estate of J.J.).

62.     The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, the heirs-at-law and the Estate of J.J. Lopez, such claims being asserted by and through Teresita Lopez, seek all remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code§ 71.021), the Texas constitution, common law, and all related and/or supporting case law. Therefore, J.J.'s estate (and his heirs at law) suffered the following damages, for which they seek recovery:

- J.J.'s conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- medical expenses;

- funeral expenses; and

- exemplary/punitive damages.

63.     Plaintiff, Teresita Lopez, individually, also seeks all remedies and damages available to her for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful

Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code). She seeks those damages due to the wrongful death of her biological and legal son - J.J. Lopez. The damages suffered by Ms. Lopez were caused and/or proximately caused by Sheriff Lt. Cagle and Deputies Rivera and Aldana. If J.J. had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law. Therefore, Lt. Cagle's and Deputies Rivera's and Aldana's actions/inactions caused, were the proximate cause of, and/or were the producing cause of the following damages suffered by Teresita Lopez:

- loss of services that she would have received from her son, J.J.;

- expenses for J.J.'s funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, J.J.;

- future mental anguish and emotional distress resulting from and caused by the death of her son, J.J.;

- loss of companionship and society that she would have received from her son, J.J.; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of J.J.'s constitutional rights. Lt. Cagle's and Deputies Rivera's and Aldana's actions and inaction showed reckless or callous disregard of, or indifference to, J.J.'s rights and safety.

64.     The policy, practice and custom of these Defendants of failing to provide medical and mental health care for inmates with serious medical conditions resulted in J.J.'s death.

**Cause of Action Against Bexar County, Sheriff Pamerleau Under 42 U.S.C. § 1983
for Violation of J.J. Lopez's 14th Amendment Due Process Right to Reasonable
Medical Care to be Protected and Not to be Punished as Pre-trial Detainee
(Conditions of Confinement)**

65.     Plaintiffs incorporate the allegations of paragraphs 1 through 59 above.

66.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Bexar County is liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating J.J.'s right to reasonable medical care guaranteed by the Fourteenth Amendment to the United States Constitution. Claims in this section are typically referred to as "conditions of confinement" claims. According to the Fifth Circuit Court of Appeals, the deliberate indifference standard in the context of Section 1983 claims based on official municipal policies is less stringent that the deliberate indifference standard used for Section 1983 claims based on the isolated actions of individual policymakers. Whereas the deliberate indifference standard for the actions of individual policymakers requires subjective awareness of the inmate's serious medical condition, the deliberate indifference standard for the official policy or practice Section 1983 claim is objective. Pre-trial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals. Bexar County acted or failed to act under color of state law at all relevant times. Bexar County's custom(s) or policy(ies) caused J.J.'s death and the Plaintiffs' resulting damages. Sheriff Susan Pamerleau was a policymaker for the County at all

relevant times, and she was the chief policymaker at all such times for the Bexar County Adult Detention Center, which held J.J.  Her and Bexar County's failure to adopt, upon information and belief, an effective prisoner suicide policy was an intentional choice. This policy should include a broad number of topics and specific policies within it.  Thus, Bexar County was deliberately indifferent regarding its prisoners with suicidal tendencies.  It had in place a general policy of inconsistently checking inmates sixty or thirty minutes.  This was a deliberate choice to violate constitutional rights, in light of 5 suicides in 13 months prior suicides a the Bexar County Jail and Judge Goldberg's 1992 admonition. This policy, as well as the failure to adopt an appropriate policy, and related custom, were the moving forces behind the violation of J.J.'s rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.

67.    Also, upon information and belief, the County did not adequately train its deputies regarding the handling and medical/mental health care of detainees. Just in a span of 1 month - from June 28th to July 28th 2016 - there were four suicides at the Bexar County Jail.  Based on information and belief, there was additional training provided to Bexar County deputies, but unfortunately, that training was far too late for J.J.  Importantly, regarding deliberate indifference, the failure to conduct such training before someone died (such as with at least two (2) prior known suicides) showed the callous and reckless indifference by County regarding the rights of suicidal prisoners.

68.    Bexar County's action and inaction caused, proximately caused, and was a producing cause of J.J.'s death and other damages suffered by Teresita Lopez,

Individually and on behalf of the Estate of J.J. Lopez. Those actions and inaction violated J.J.'s constitutional rights.

69.     The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, the heirs-at-law and the Estate of J.J. Lopez, such claims being asserted by and through Teresita Lopez seek all remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code§ 71.021), Texas constitution, common law,    and/or all related and/or supporting case law.  Therefore, J.J.'s estate (and his heirs at law) suffered the following damages, for which they seeks recovery:

- •   J.J.'s conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- •   medical expenses; and

- •   funeral expenses.

70.     Plaintiff, Teresita Lopez, individually, also seeks all remedies and damages available to her for the 42 U.S.C. § 1983 violations· pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code).  She seeks those damages due to the wrongful death of her biological and legal son - Jesus Jose "J.J." Lopez.  The damages suffered by Teresita Lopez were caused and/or proximately caused by Lt. Cagle and Defendant Deputies. If J.J. had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law.  Therefore, Lt. Cagle and Defendant Deputies actions caused, were the proximate cause of, and/or were the producing cause of the following damages suffered

by Teresita Lopez:

- loss of services that she would have received from her son, J.J.;

- expenses for J.J.'s funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, J.J.;

- future mental anguish and emotional distress resulting from and caused by the death of her son, J.J.; and

- loss of companionship and society that she would have received from her son, J.J.

### Causes of Action Against Bexar County for Violation of Americans with Disabilities Act and Rehabilitation Act

71.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Bexar County is liable to the Plaintiffs pursuant to the Americans with Disabilities Act ("ADA") and federal Rehabilitation Act. Upon information and belief, the County has been and is a recipient of federal funds. Therefore, it is covered by the mandate of the federal Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with mental and physical disabilities in their facilities, program activities, and services, and also reasonably modify such facilities, services, and programs to accomplish this purpose. Further, Title II of the ADA applies to Bexar County and has the same mandate as the Rehabilitation Act. Claims under both the Rehabilitation Act and ADA are analyzed similarly.

72.     The Bexar County Jail jail/holding facility is a "facility" for purposes of both the rehabilitation  and ADA, and the jail's  operation  comprises a program and services  for Rehabilitation Act and ADA purposes.   Jesus Jose "J.J." was a qualified individual for purposes of the Rehabilitation Act and ADA, regarded as having a mental impairment and/or medical condition that substantially  limited one or more of his major life activities (and thus disabled). J.J. was also discriminated against by reason of his disability.

73.     A majority  of circuits  have held, for purposes of Rehabilitation  Act and ADA claims, that one may prove intentional  discrimination  by showing that a defendant acted with deliberate indifference.  The Fifth Circuit has declined to follow the majority view.   Nevertheless, intent can   never be shown  with certainty.   Direct and circumstantial  evidence can be used to support an "intent"  jury finding, and allegations in this pleading show that there is more than enough of both.

74.     Bexar County's failure and refusal to accommodate J.J.'s  mental disabilities while in custody violated the Rehabilitation Act and the ADA. Such failure and refusal caused,  proximately caused, and was a producing  cause of J.J.'s  death and the Plaintiffs' damages.

75.     Bexar County's violations  of  the Rehabilitation  Act  and  the ADA included its failure to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate J.J.'s  mental disabilities.   These failures and refusals, which were intentional, proximately caused  J.J.'s   death and  the  Plaintiffs' damages. Because J.J.'s death resulted from Bexar County's intentional discrimination against

him, the Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.  The Plaintiffs seek all such damages itemized in the prayer and or body in this pleading (including sections above giving appropriate and fair notice of the Plaintiffs' 42 U.S.C. § 1983 claims and resulting damages) to the extent allowed by the Rehabilitation Act and the ADA.

## VI. CONDITIONS PRECEDENT

76.     All conditions precedent to assertion of the Plaintiffs' claims have occurred.

## VII. USE OF DOCUMENTS AT TRAIL OR PRETRIAL PROCEEDING

77.     The Plaintiffs intend to use at one or more pretrial proceedings and/or at trial all documents produced by the Defendants in this case in response to written discovery requests.

## VIII. JURY DEMAND

78.     The Plaintiffs demand a jury trial and will pay the appropriate fee.

## IX. PRAYER

79.     For these reasons, the Plaintiffs ask that the Defendants be cited to appear and answer, and that the Plaintiffs have judgment for damages within the jurisdictional limits of the court and against the Defendants, jointly and severally, as legally applicable, for:

a)      actual damages of and for Teresita Lopez individually including but not necessarily limited to the following:

- loss of services that she would have received from her son, J.J.;
- expenses for J.J.'s funeral;
- past mental anguish and emotional distress resulting from and caused by the death of her son, J.J.;
- future mental anguish and emotional distress resulting from and caused by the death of her son, J.J.; and

- loss of companionship and society that she would have received from her son, J.J.;

b) actual damages of and for the Estate of Jesus Jose J.J. Lopez by and through Teresita Lopez including but not necessarily limited to the following:
- conscious pain and suffering; and
- funeral expenses;

c) exemplary/punitive damages for all Plaintiffs from Defendants;

d) reasonable and necessary attorneys' fees through trial and any appeals and other appellate proceedings;

e) court costs and all other recoverable costs;

f) prejudgment and postjudgment interest at the highest allowable rates; and

g) all other relief, legal and equitable, general and special, to which the Plaintiffs are entitled.

Respectfully submitted,

_____ /s/ Mauro F. Ruiz _____
Mauro F. Ruiz
State Bar No. 24007960
Federal ID. 23774
118 West Pecan Blvd.
McAllen, Texas 78501
Telephone: (956) 259-8200
Telecopier: (956) 259-8203
mruiz@mruizlaw.com
**ATTORNEY-IN-CHARGE FOR PLAINTIFFS**

OF COUNSEL:
**RUIZ LAW FIRM, P.L.L.C.**
118 West Pecan Blvd.
McAllen, Texas 78501
Telephone: (956) 259-8200
Telecopier: (956) 259-8203

_____/s/ Robbie Ward_____
Robbie Ward
State Bar No. 24033435
Neil A. Calfas
State Bar No. 50511505
310 S Saint Mary's Street, 24th Floor
San Antonio, Texas 78205
Tel.  (210) 212-6969
Fax  (210) 212-7766
robbie@calfaslaw.com
neil@calfaslaw.com
**ATTORNEYS FOR PLAINTIFFS**

OF COUNSEL:
**CALFAS LAW GROUP, PLLC**
310 S Saint Mary's Street, 24th Floor
San Antonio, Texas 78205
Tel.  (210) 212-6969
Fax  (210) 212-7766